**NORTHERN TANKERS (CYPRUS) LTD., Plaintiff,**

v.

**Adam BACKSTROM, et al., Defendants.**

**No. 3:95CV1217(GLG).**

United States District Court, D. Connecticut.

June 5, 1997.

John D. Kimball, W. Cameron Beard, Healy & Baillie, New York City, for plaintiff.

Robert F. Wise, Jr., Davis, Polk & Wardwell, New York City, for defendants other than Bernth Ahlstroem.

David M. Rubin, New York City, for defendant Bernth Ahlstroem.

## OPINION

GOETTEL, District Judge:

The issues of corporate veil piercing presented in this case are interesting. Unfortunately, the trial was not. It was long, and involved the presentation of thousands of pages of exhibits and seemingly endless hours of testimony. We will not attempt to identify all of the evidence from which we make the following findings of fact and conclusions of law.

## BACKGROUND

### I. The Underlying Action

Plaintiff Northern Tankers (Cyprus) Ltd. ("Northern Tankers"), a corporation organized under the laws of Cyprus and with its principal place of business in Cyprus, is in the business of chartering ships, primarily oil tanker vessels. In the spring of 1990, when the events giving rise to this litigation began, the charter market for tankers was reasonably healthy. Plaintiff had a very large crude carrier ("VLCC"), the INDEPEN-

DENCE, on long term charter from another company, and sought to sub-charter the vessel to cover the remaining five-year period of its commitment. A sub-charter at the relatively high market rates at that time would have yielded a steady profit for the five-year period.

In 1990, defendants Adam Backstrom ("Backstrom") and Magnus Lindholm ("Lindholm") were known in the shipping industry to be the principals of a large group, known as "Lexmar" or "Starlux," which had in the late 1980s purchased at least thirty ships from the Spanish government for resale and charter, and which also had chartered numerous VLCCs from well known shipowners for a pooling agreement with Shell Oil Company (the "Shell pool"). One of the companies within the Lexmar group of shipping companies was Lexmar Corporation (Liberia) ("Lexmar Liberia").

In late June 1990, plaintiff and Lexmar Liberia entered into an oral charter party,[1] pursuant to which Lexmar Liberia chartered the INDEPENDENCE for a period of five years. Before the sub-charter had been committed to writing, Iraq invaded Kuwait on August 2, 1990, creating uncertainty in the tanker market. Lexmar Liberia thereafter, in early September 1990, repudiated its agreement with plaintiff, claiming no contract had ever been formed. Lexmar Liberia also defaulted on its obligations to owners of other VLCCs it had chartered, although the majority of the resulting disputes were settled.

On October 19, 1990, plaintiff initiated suit against Lexmar Liberia in the United States District Court for the Southern District of New York, seeking damages for breach of the subcharter contract for the INDEPENDENCE. The case was referred to arbitration in January 1992, and the liability and damages issues were bifurcated. In March 1994, the arbitrators issued a partial final award in plaintiff's favor on the issue of liability, and in April 1995, the arbitrators

issued a final award of damages of $11,172,-873.48. Plaintiff then applied to confirm the arbitration award, and the award was confirmed by summary order dated March 25, 1996. An Amended judgment was entered against Lexmar Liberia on April 25, 1996 in the amount of $11,964,223.82.

## II. This Action

On June 21, 1995, plaintiff commenced the instant action against Backstrom, Lindholm, Lexmar Liberia and numerous other corporate, partnership, and trust defendants, attempting to collect the damages it had been awarded from Lexmar Liberia. Six days later, Lexmar Liberia filed for dissolution in Liberia, and three days after that, it filed for bankruptcy protection under the laws of Sweden. There is no dispute that Lexmar Liberia currently has insufficient known assets to satisfy any substantial part of plaintiff's judgment.

In this action, plaintiff seeks to impose liability on a number of grounds on Backstrom, Lindholm and the shipping and real estate entities they created. We discuss plaintiff's different theories below, but note here that all causes of action relate to one central theme: the disregard by Backstrom and Lindholm of the corporate forms of the various defendant entities, and the misuse of corporate forms in an effort to avoid taxes and remove assets from the reach of their creditors.

### A. The Defendants

There are 53 individual, corporate, partnership and trust defendants. We identify the different defendants in an attempt to explain the hierarchy of legal fictions defendants have created and to aid plaintiff in its attempt to collect on the judgment that will be entered in this case. While specifically identifying the individual corporations, partnerships and trusts comprising the "corporate Gordian Knot which the defendants have

---

1. As is discussed below, whether the discussions involving the charter of the INDEPENDENCE actually constituted a binding oral contract has already been litigated. While the issue is not before us, we note that evidence produced at trial amply supports the arbitrators' conclusion that such a contract existed. Although Backstrom and Lindholm did not subsequently approve of the contract, internal company memos make clear that the INDEPENDENCE was considered part of Lexmar Liberia's fleet following the oral agreement with Northern Tankers.

created," *Bergesen d.y. A/S v. Lindholm,* 760 F.Supp. 976, 981 n. 8. (D.Conn.1991), as discussed below, we find that defendants Backstrom and Lindholm effectively controlled and dominated one large shipping and real estate entity. These "seemingly separate and independent corporate defendants which have been sued here are, in reality, interdependent components of a single, far-flung and deliberately convoluted enterprise that is personally controlled by Backstrom and Lindholm." *Id.* at 989.[2]

Defendants Backstrom and Lindholm are citizens of Sweden and residents of various jurisdictions, including the State of Connecticut. They have or have had extensive shipping and real estate interests in the United States. These interests include a group of shipping companies ("the shipping defendants"), including Lexmar Liberia, and a group of real estate companies ("the real estate defendants"). Lindholm also controls corporations, limited liability companies, and a trust organized under the laws of the State of Colorado (the "western land defendants").

Defendant Kerstin Lindholm is a citizen of Sweden and a resident of the State of Connecticut. She is the wife of defendant Lindholm, and has from time to time purportedly served as the owner of the shares of the Panamanian companies, Macro Finance S.A. and defendant Finance Generale Internationale S.A. ("Finance Generale"). Finance Generale is a company established under the laws of Panama on May 18, 1993, and is the nominal owner of mortgages on property belonging to several of the real estate defendants. The shares of Finance Generale were purportedly transferred by Kerstin Lindholm to Macro Finance S.A. in October 1994 and thence back to Kerstin Lindholm in May 1996. The shares of Macro Finance S.A. were purportedly transferred by Kerstin Lindholm in stages between 1993 and 1995 to defendant Bernth Ahlstroem ("Ahlstroem"), a Swede resident in Switzerland, from whom the shares were purportedly re-transferred to Kerstin Lindholm in October 1996.

### 1. The Shipping Defendants

Defendant Star Chart Shipping Corp. ("Star Chart") is a corporation organized under the laws of Liberia. At trial, the evidence was somewhat unclear as to its operation. An accountant for defendants testified that the name Star Chart was used in the accounting books to segregate some of Lexmar Liberia's operations. There was some evidence, however, that Star Chart was at least held out to others as being an independent corporation. Regardless, the accounts and financial activities of Star Chart were commingled with those of Lexmar Liberia.

Defendant Lexmar (France) S.A. ("Lexmar France") is a corporation organized under the laws of France. It became a subsidiary of Lexmar Liberia when it was apparent that it was a losing venture that had amassed substantial debts. It is currently in liqui-

2. In November 1990, another VLCC-owner, the ship owning company of Bergesen d.y. A/S, filed suit in the United States District Court for the District of Connecticut against Lexmar Liberia, Starlux, Backstrom, Lindholm and numerous of the other entities who are defendants in the instant action, claiming damages for breach of contract from all defendants on an alter ego theory. Following an evidentiary hearing on Bergesen's application for a prejudgment remedy, United States Magistrate Judge Thomas P. Smith attached many of defendants' assets. In his decision, *Bergesen d.y. A/S v. Lindholm,* 760 F.Supp. 976 (D.Conn.1991), Judge Smith found probable cause to pierce many corporate veils and hold defendants personally liable for Lexmar Liberia's breach of contract. Among his findings, Judge Smith found considerable evidence of defendants' disregard of corporate forms. He also noted defendants' extraordinary attempts of placing assets beyond the reach of their many creditors.

At trial in the instant case, plaintiff sought to have Judge Smith's opinion admitted into evidence. In ruling on defendants' objection to the admission of the opinion, the Court stated:

I don't think I can accept as evidence Judge Smith's decision because it would then be proof of factual matters that I have to determine myself and under a slightly higher level of proof. On the other hand, I am certainly going to consider the decision from the standpoint of the legal conclusions reached based on the facts that he found. And if I find the same facts, it will be persuasive precedent. But I sustain the objection to it as evidence of the facts.

Accordingly, our discussion of Judge Smith's factual findings throughout this opinion should not be interpreted as findings of fact regarding the underlying evidence. As is discussed below, however, we agree with most, if not all, of Judge Smith's findings of fact and conclusions of law.

dation proceedings in France. Lexmar Liberia currently owns 100% of the shares of Lexmar France.

Defendant Starlux Corp. ("Starlux") is a corporation organized under the laws of Liberia and is the sole shareholder of Lexmar Liberia and most of the other shipping defendants.

Defendant Atlantic Brands Corp. ("Atlantic Brands") is a corporation organized under the laws of Liberia, and is the parent corporation of Starlux, owning 100% of its shares. Lindholm owns 50% of the shares of Atlantic Brands and Backstrom owns 5%. Defendant Cohort Trust, a trust organized under the laws of the Bahamas, is the owner of the remaining 45% of the shares of Atlantic Brands. Backstrom owns, dominates, and controls Cohort Trust.

Defendants Mid–Atlantic Transportation Corp. ("Mid–Atlantic"), Eastgate Shipping Corp. ("Eastgate"), E–B Shipping Corp. ("E–B"), Gunvor Shipping Corp. ("Gunvor"), Lux Challenger Shipping Corp. ("Lux Challenger"), Lexmar Espana S.A. ("Lexmar Espana"), Lux Rig Corp. ("Lux Rig"), Seatraveller II Corp. ("Seatraveller II"), Lexmar Do Brasil, and Greater Southampton Enterprises, Ltd. ("Greater Southampton Enterprises") are 100% owned subsidiaries of Starlux. They were all minimally capitalized and shared numerous officers and directors.

Defendant Lexmar Norge A/S ("Lexmar Norge") is a corporation organized under the laws of Norway. Starlux owns or owned at least 85% of the shares of Lexmar Norge.

Defendant Lexmar Corp. (Connecticut) ("Lexmar Connecticut") is a corporation organized under the laws of the State of Connecticut with an office and principal place of business in Greenwich, Connecticut. It managed the business of the shipping companies.

Defendant Pullman Shipping Co. Ltd. ("Pullman") is a corporation organized under the laws of a jurisdiction other than the United States. Pullman is the parent company of Lexmar Connecticut, owning 100% of its shares.

Defendant Lexmar Shipping (UK) Ltd. ("Lexmar UK") is a corporation organized under the laws of the United Kingdom, and performed charter brokerage services on behalf of Lexmar Liberia.

Defendant Erwin Shipping Co. S/A ("Erwin") is a corporation organized under the laws of a jurisdiction other than the United States. Erwin is the parent company of Lexmar UK, owning 100% of its shares.

Defendants Almendro Shipping Co. ("Almendro"), Magnolio Shipping Corp. ("Magnolio"), Naranjo Shipping Co. ("Naranjo"), and Nogal Shipping Co. ("Nogal") (together the "Spanish shipping defendants") are corporations organized under the laws of Liberia, whose stock was owned by Starlux or otherwise by companies under the control of Backstrom and Lindholm. The Spanish shipping defendants owned vessels purchased from Lexmar Espana.

### 2. The Real Estate Defendants

Defendant Intermobil Realty & Development Corp. ("Intermobil") is a corporation organized under the laws of the State of Connecticut, with an office and principal place of business in Greenwich, Connecticut. Ahlstroem is the registered owner of the one share of Intermobil; however, as described below, we find Backstrom is the true beneficial owner of Intermobil and its asset, the property at 30 Crown Lane in Greenwich, Connecticut at which Backstrom and his family have resided.

Defendant Crown Estates, Inc. ("Crown Estates") is a corporation organized under the laws of the State of Connecticut, with an office and principal place of business in Greenwich, Connecticut. Backstrom is the owner of 100% of the shares of Crown Estates. The property owned by Crown Estates abuts the Backstrom estate at 30 Crown Lane.

Defendant Robin Hill Farm Inc. ("Robin Hill") and Smokey Hill Farm, Inc. ("Smokey Hill") are corporations organized under the laws of the State of Connecticut with offices and principal places of business in Greenwich, Connecticut. The shares of Robin Hill and Smokey Hill are owned by Lindholm. The primary assets of these defendants are two adjacent residential properties in Green-

wich, Connecticut, in one of which Lindholm and his family reside.

Defendant Baseboard S.A. ("Baseboard") is a corporation organized under the laws of Luxembourg and is owned by Backstrom. Baseboard is the owner of 100% of the shares of defendant Lexington Development Group, Inc. ("Lexington Development").

Lexington Development is a corporation organized under the laws of the State of Delaware, with an office and principal place of business in Greenwich, Connecticut. Lexington Development is in the business of real estate development. Its original paid-in capital was $10.00. While originally the owner of numerous active real estate subsidiaries, Lexington Development's sole activity at present is the ownership of the shares of Lexington Hotel Corp.

Defendant Lexington Hotel Corp. ("Lexington Hotel") is a corporation organized under the laws of Connecticut, with an office and principal place of business in Greenwich, Connecticut. Lexington Hotel is a 98%-owned subsidiary of Lexington Development. Finance Generale, however, has an option to purchase the shares of the company, and Backstrom and Lindholm have a 50/50 profit sharing agreement with respect to the hotel's operations. Lexington Hotel owns the Greenwich Harbor Inn, a hotel and restaurant in Greenwich, Connecticut. Lexington Hotel was formed on or about January 26, 1990, with an original paid-in capital of $1,000.00. It is one of the few solvent corporate defendants in this case.

Defendants Lexington Construction Corp. ("Lexington Construction"), Eagles Management Inc. ("Eagles Management"), Lexington Building Systems Inc. ("Lexington Building Systems"), 820 Riverside Drive Corp. ("820 Riverside Drive"), 145 East 32rd Street Realty Corp. ("145 East 32nd Street"), Harbor Hospitality Corp. ("Harbor Hospitality"), Eagle–Hus International Inc. ("Eagle–Hus"), and Old Road Development Corp. ("Old Road Development") are corporations organized under the laws of various states, with offices and principal places of business in Greenwich, Connecticut. All are wholly-owned subsidiaries of Lexington Development and were minimally capitalized. Defendant Val-

halla Swedish Associates is a partnership whose general partner and 98% owner was Lexington Development.

Defendant Lexmar Corporation (Delaware) ("Lexmar Delaware") is a corporation organized under the laws of the State of Delaware, originally involved in ship management on behalf of the shipping defendants. It was replaced by Lexmar Connecticut. Lexmar Delaware is a wholly-owned subsidiary of Lexington Development.

### 3. The Western Land Defendants

Defendant Piney Valley Ranches Trust ("Piney") is a grantor trust organized under the laws of the State of Colorado. Its grantor's rights were purportedly transferred by Lindholm to defendant Lava Corporation ("Lava") on December 31, 1992.

Lava is a corporation organized under the laws of the State of Colorado. Lindholm owns 100% of the issued and outstanding shares of Lava. On December 31, 1992, the same date that Lindholm purportedly transferred the grantor's rights in Piney to Lava, the latter purportedly transferred the said grantor's rights to defendant Alkali Company ("Alkali").

Alkali is a limited partnership organized under the laws of the State of Colorado, the general partner of which is Lava, and the limited partners of which are trusts established for the benefit of Lindholm's four children.

Defendant EMD Limited Liability Company ("EMD") is a limited liability company incorporated under the laws of the State of Colorado. EMD is currently owned by Piney (85%) and 260 Peachtree Street Inc. (15%).

Defendant Stark Creek Limited Liability Co. ("Stark Creek") is or was a limited liability company incorporated under the laws of the State of Colorado. When established in 1992, Lindholm's four children owned 100% of the stock.

Defendant Eagle Mountain Development, Inc. ("Eagle Mountain") is a corporation established under the laws of the State of Colorado.

### III. Status of all Defendants

The following defendants have appeared and answered the complaint: Backstrom, Lindholm, Atlantic Brands, Lexington Development, Starlux, Eastgate, Lexmar Espana, E–B, Greater Southampton Enterprises, Lexmar Norge, Lexington Construction, Lexington Hotel, Eagles Management, Eagle–Hus, Lexington Building Systems, 820 Riverside Drive, Lexmar Delaware, 145 East 32nd Street Realty, Harbor Hospitality, Valhalla Swedish Associates, Old Road Development, Intermobil, Crown Estates, Smokey Hill, Robin Hill, Finance Generale, Kerstin Lindholm, Lava, Alkali, and Ahlstroem.

The following defendants have contested jurisdiction[3] but, pursuant to our adoption of special master Professor Lewis Kurlantzick's recommended ruling, have been found to be subject to this court's jurisdiction: Piney, EMD, Stark Creek, Eagle Mountain, Almendro, Magnolio, Naranjo and Nogal. None of these defendants have answered the complaint.

Lastly, the following defendants have not appeared and a default has previously been entered against them: Lexmar Liberia, Lexmar Connecticut, Erwin, Lexmar UK, Pullman, Gunvor, Lux Challenger, Star Chart, Mid–Atlantic, Lux Rig, Lexmar France, Seatraveller II, Lexmar Do Brasil, Cohort Trust and Baseboard.

### DISCUSSION

### I. JURISDICTION

As an action to collect an arbitration award for breach of a sub-charter agreement, we have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333, *see generally Sirius Insurance Co. (UK) Ltd. v. Collins,* 16 F.3d 34 (2d Cir.1994), and jurisdiction over the state law claims under the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

■ Personal jurisdiction is a more difficult issue. Defendants Backstrom, Lindholm and many other entities have not contested jurisdiction in this case. Several of the defendants, however, have contested jurisdiction. As we held in an earlier decision in this case, *see* 901 F.Supp. 72, 76 (D.Conn.1995), since an alter ego is considered to be an indistinguishable entity, jurisdiction over the defendants that have not contested jurisdiction establishes jurisdiction over any such defendants' alter egos. *See Bally Export Corp. v. Balicar, Ltd.,* 804 F.2d 398, 405 (7th Cir.1986); *In re Ocean Ranger Sinking Off Newfoundland on February 15, 1982,* 589 F.Supp. 302, 310–12 (E.D.La.1984); *ACS Industries, Inc. v. Keller Industries, Inc.,* 296 F.Supp. 1160, 1161–63 (D.Conn.1969). Determining who is an alter ego, however, was not possible prior to trial since it is the main factual dispute in this case. As will be discussed below, we find that Backstrom and Lindholm operated one large enterprise through which they conducted their real estate, shipping, and personal business. As members of this enterprise, almost all defendants are alter egos of each other and of Backstrom and Lindholm. We therefore find that we have personal jurisdiction over all these defendants who were served with process. To the extent that any defendants are not part of this enterprise, but still alter egos of any other defendant, we also have jurisdiction over such defendants.

### II. ALTER EGO CLAIMS

As we have previously ruled in this case, federal common law governs plaintiff's veil-piercing claims. *See Matter of Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda Ltd.,* 774 F.Supp. 840, 844 (S.D.N.Y.1991); *Bergesen,* 760 F.Supp. at 986. While we may import into our decision those principles of state law which we find both persuasive and appropriate to subsume, *see Holborn,* 774 F.Supp. at 844; *Bergesen,* 760 F.Supp. at 987, the applicable federal maritime law is sufficiently clear so as to warrant no reliance on state law.

The Second Circuit has held that in order to pierce the corporate veil in federal maritime law, an individual defendant must have

---

**3.** Several of the defendants listed above also contested jurisdiction, but have answered the complaint after their motions to dismiss were denied.

used his or her corporation to perpetrate a fraud, or have so dominated and disregarded its corporate form that it primarily transacted the individual's personal business rather than its own corporate business. *See Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980); *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 342 (2d Cir.1986).

◼ Defendants argue, citing numerous cases, that plaintiff's claim of domination and control alone cannot support the piercing of a corporate veil, because the law also requires that plaintiff prove some wrong or inequity. *See e.g. Wm. Passalacqua Builders Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir.1991) ("control must be used to commit a fraud or other wrong that causes plaintiff's loss"); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.)(a claim of domination requires a showing that "such domination must have been used to 'commit fraud or wrong' against plaintiff") (citation omitted), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). They assert that the requirement of some showing of wrong or inequity is particularly important in commercial cases involving sophisticated plaintiffs who are presumed to have understood and intended the consequences of dealing with a particular corporate entity. *See Brunswick Corp. v. Waxman,* 599 F.2d 34, 36 (2d Cir.1979). Defendants therefore argue that plaintiff's knowledge and sophistication are relevant in determining whether it would be inequitable to hold plaintiff to the terms of its agreement. *See United States v. Kokolakis Contracting, Inc.,* No. 93 Civ. 6369(LBS), 1995 WL 539742, at *7–8 (S.D.N.Y. Sept.8, 1995). Since plaintiff was a sophisticated business, defendants assert that there is no inequity and the veil piercing doctrine may not be invoked to rescue plaintiff from an unfavorable or unwise business dealing. While we discuss the merits of these arguments, as discussed below (*see* section 2B), we find that plaintiff has proven fraud or inequity sufficient to satisfy any such requirement.

At first glance, Second Circuit case law regarding whether domination and control alone, without fraud and inequity, is enough to pierce the corporate veil appears confused. Upon further examination, however, the majority of the cases cited by both sides can be reconciled with each other. While defendants are correct that many cases require a finding of fraud or inequity, these cases address New York law and not federal maritime law.

In *Kirno Hill Corp. v. Holt,* 618 F.2d at 985, the Second Circuit stated:

> The prerequisites for piercing a corporate veil are as clear in federal maritime law as in shoreside law: [the individual defendant] Holt must have used [his corporation] Waterside–Pennsylvania to perpetrate a fraud or have so dominated and disregarded Waterside–Pennsylvania's corporate form that Waterside–Pennsylvania primarily transacted Holt's personal business rather than its own corporate business. *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979); *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 523 F.2d [527, 539 (2d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) ].

While the Court noted that the requirements were the same for federal maritime law as for shoreside law, there is no indication as to which shoreside law the Court was referring. As discussed below, however, while subsequent cases have adopted the Court's holding as the proper rule for federal maritime law, they have not adopted the Court's conclusion that this rule is the same for shoreside law.

Without reference to the two cases cited in *Kirno Hill* in support of this statement— *Gartner,* 607 F.2d 582, and *Interocean Shipping,* 523 F.2d 527, the Court's use of the disjunctive "or" appears to set forth alternative methods of piercing the corporate veil— either by a showing of fraud *or* by a showing of domination. This interpretation is fully supported by *Gartner,* where the Court stated:

> Because New York courts disregard corporate form reluctantly, they do so only when the form as been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it pri-

marily transacted the dominator's business rather than its own and can be called the other's alter ego.

607 F.2d at 586. In contrast, however, in *Interocean Shipping,* the Second Circuit refused to pierce the corporate veil and hold a non-signatory bound by an arbitration agreement. The Court stated:

> But even if we viewed Hellenic as having no mind of its own, i.e., that it was completely dominated by H.T. and National, there is no evidence in the record before us that such control was used to perpetrate a fraud or something akin to fraud. Such a showing is a sine qua non to holding a non-signatory bound by an arbitration agreement.

523 F.2d at 539. *Kirno Hill,* alone, is therefore less than instructive on this issue. While the plain language and the citation to *Gartner* support plaintiff's position that it need not prove fraud or inequity, the citation to *Interocean Shipping* supports defendants' position that fraud or inequity is a requirement.

In subsequent cases, however, the Second Circuit has not only cited *Kirno Hill* and *Gartner,* but also repeated this disjunctive statement. In *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d at 342, the Second Circuit found that the trial court had correctly held that the test for piercing the corporate veil in a maritime context was enunciated in *Kirno Hill.* Likewise, in *Itel Containers International Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 703–04 (2d Cir.1990), the Second Circuit quoted the language from *Kirno Hill* in its discussion of the law on this issue. In reviewing the district court's decision not to pierce the corporate veil in light of this law, the *Itel* Court then stated:

> The district court's rejection of plaintiffs' claim was consistent with these principles, for the court not only found that plaintiffs had failed to show any fraud by SCL but also found that they had failed to show

sufficient control and domination by SCL of AES Ltd. or of AES Inc. to make either of them SCL's alter ego.

909 F.2d at 704. Similarly, in *Passalacqua,* 933 F.2d at 138 and *Carte Blanche (Singapore) Pte., Ltd., v. Diners Club International, Inc.,* 2 F.3d 24, 26 (2d Cir.1993), the Second Circuit cited *Kirno Hill* as stating the federal maritime law relating to piercing the corporate veil.

In contrast, no Second Circuit decision since *Kirno Hill* has quoted *Interocean Shipping* as stating the correct federal maritime law rule for piercing the corporate veil.[4] Therefore, upon a review of all relevant Second Circuit case law, we find the proper rule for piercing the corporate veil in federal maritime cases is set forth in the language of *Kirno Hill.*

Defendants' arguments to the contrary are unpersuasive. Other than *Interocean Shipping,* the only federal maritime case cited by defendants in support of their argument that we must find fraud or inequity, in addition to domination and control, is *Ope Shipping, Ltd. v. Allstate Insurance Co., Inc.,* 687 F.2d 639 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983). In that case, the Court held: "[i]n the absence of a finding that such fraud or misrepresentation was perpetrated on the defendants as would make it inequitable to hold them to the terms of their contracts, the district court should not have disregarded the corporate existence and titles." 687 F.2d at 642. Defendants interpret this language as requiring inequity in order to pierce the corporate veil. We disagree. This quoted language comes after the Court's finding that a party's complete ownership of the corporation alone did not warrant piercing the corporate veil. Read in context, therefore, the Court appears to have considered both the domination and fraud alternatives, and rejected both. Even interpreting *Ope Shipping* as defendants would have us do, however, we would nonetheless

---

4. The only Second Circuit case that has cited *Interocean Shipping* in a discussion of this federal maritime law is *Dow Chemical,* 782 F.2d at 342. In that case, the Court again cites both *Interocean Shipping* and *Gartner* in support of the test enunciated in *Kirno Hill.* Because it quotes the language of *Kirno Hill* and only cites *Interocean Shipping* as one case supporting this language, we do not believe the *Dow Chemical* Court adopted the fraud or inequity requirement apparently present in *Interocean Shipping.*

be inclined to follow the more recent Second Circuit cases discussed above that have cited *Kirno Hill* as the proper test under federal maritime law.[5]

The majority of the other cases cited by defendants are situations where federal courts have applied New York law.[6] *See Passalacqua*, 933 F.2d at 137; *American Protein*, 844 F.2d at 60; *Brunswick*, 599 F.2d at 35; *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 17 (2d Cir.1996); *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.1989). We find no reason to rely on New York law.[7] While defendants apparently believe that New York and federal maritime law are the same, we do not. New York law may well require a showing of fraud or inequity, but as we have just discussed, federal maritime law has no such requirement. Although not specifically identifying this difference, the Second Circuit has recognized that federal maritime law on this issue differs from New York law. In both *Passalacqua*, 933 F.2d at 138, and *Carte Blanche*, 2 F.3d at 26, the Court has cited New York law and then used the signal "cf." [8] to reference the federal mari-

time law enunciated in *Kirno Hill.* While we may therefore be as reluctant as New York courts to pierce corporate veils, *see Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985), our determination is governed by different rules.

### A. Domination and Control

We first address the domination and control prong. Before identifying specific evidence supporting our conclusion on this issue,' however, a brief observation regarding defendants Backstrom and Lindholm's operations is in order. Backstrom and Lindholm are wealthy and intelligent individuals who employed very capable financial and legal assistance even prior to any of the legal disputes relevant to this action. Backstrom and Lindholm have, with this professional assistance, created and maintained numerous corporations, partnerships and trusts, and have used friends and associates as "straw men" owners of their property. Surely one of the main benefits defendants sought with such efforts was the limitations of liability that these ownership forms provide. Defendants have set up corporations that own cor-

**5.** We also decline to follow *Fisser v. International Bank*, 282 F.2d 231 (2d Cir.1960). There, the Court, in admiralty, found that, in addition to domination and control, a plaintiff must also prove that "[s]uch control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." 282 F.2d at 238 (quoting *Lowendahl v. Baltimore & O.R. Co.*, 247 A.D. 144, 287 N.Y.S. 62 (A.D. 1st Dept.), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936)). Like *OPE Shipping*, *Fisser* has not been subsequently quoted by the Second Circuit as the federal maritime law for piercing the corporate veil. To the extent *Fisser* is in conflict with *Kirno Hill*, we find that *Kirno Hill* and the more recent Second Circuit cases cited above have impliedly overruled it.

**6.** Defendants do, however, cite *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456–57 (2d Cir.1995)(applying Delaware law), and *Thomson–CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 778 (2d Cir.1995) (applying common law to the Federal Arbitration Act).

In *Thomson–CSF*, the Court applied the "common law principles of contract and agency law." 64 F.3d at 776. In discussing veil piercing and alter ego determinations, the Court quoted *Passalacqua* and *Carte Blanche* as stating the proper test, although both quotations come from those

Courts' discussions of New York law. *Id.* at 777. It might thus be argued that the requirements of piercing a corporate veil in order to enforce an arbitration agreement are the same under New York and the common law. We need not resolve that issue. As discussed below, the Second Circuit has acknowledged the difference between federal maritime law and New York law in both *Passalacqua* and *Carte Blanche*.

**7.** Were we to import principles of state law which we find "both persuasive and appropriate to subsume," *see Holborn*, 774 F.Supp. at 844; *Bergesen*, 760 F.Supp. at 987, we would import principles of Connecticut law, not New York law.

**8.** The signal "cf." is "[a]n abbreviated form of the Latin word confer, meaning 'compare.' [It d]irects the reader's attention to another part of the work, to another volume, case, etc., where contrasted, analogous, or explanatory views or statements may be found." Black's Law Dictionary 229 (6th ed.1990).

The Bluebook states that "cf." means: "cited authority supports a proposition different from the main proposition but sufficiently analogous to lend support. Literally, 'cf.' means 'compare.' " The Bluebook: A Uniform System of citation 1.2(a) at 23 (Editors of Columbia Law Review et al. eds., 16th ed. 1996).

porations that own corporations that allegedly conduct business. Defendants also own corporations that possess their personal residences.[9]

With so many legal fictions attempting to insulate each corporation from the others and attempting to insulate Backstrom and Lindholm from personal liability, where did Backstrom and Lindholm go wrong? It appears they got greedy. Many of their improper actions were successful attempts of avoiding tax liability. In addition, while defendants sought the limitations of liability which the corporate form of ownership provides, they were unwilling to endure the problems associated with such ownership. While the corporate fiction is generally recognized, even when set up for the very purpose of avoiding personal liability, *see Kirno Hill*, 618 F.2d at 985, few would doubt the increased costs and inconveniences associated with maintaining proper corporate formalities. As plaintiff persuasively argues and has factually demonstrated:

> The fact is that Defendants thumbed their nose at proper corporate conduct when it suited their purposes, and made all significant corporate decisions without regard to proper corporate protocol. While lawyers' advice might have been followed for minor formalities, all decisions of significance concerning the disposition of the assets of the shipping and real estate business generally were always made by Backstrom and Lindholm alone, without regard for the independent interests of the various subsidiaries.

Plaintiff's Post–Trial Reply Memorandum, p. 9.

■ In discussing our findings relating to plaintiff's attempts to pierce defendants' corporate veils, we discuss the fifteen factors discussed by Magistrate Judge Smith in *Bergesen*, 760 F.Supp. at 987:

> (1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent; (6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties.

While we specifically address these factors, however, we agree with defendants' assertion that these factors are not a substitute for, but rather an aid in assessing, the federal maritime law two-prong test for piercing the corporate veil: fraud or domination and control.

### 1. Common or Overlapping Stock Ownership between Parent and Subsidiary.

The shareholdings of all of the various real estate and shipping defendants not only overlap substantially, but are, ultimately, identical. In virtually all cases, the shares are beneficially owned either directly or indirectly by defendants Backstrom, Lindholm or both. In those instances where the shares of a defendant corporation were nominally not owned directly or indirectly by Backstrom or Lindholm, the economic benefits of ownership nevertheless accrued to them. Backstrom and Lindholm also had the real beneficial ownership of most of the defendant corporations, even those, like Lexmar Connecticut, which were nominally owned by third parties.

### 2. Common or Overlapping Directors and Officers

The directors and officers of the various defendants overlap substantially, with Back-

---

9. Backstrom asserts that Intermobil, the corporation that owns his Connecticut residence, is actually owned by Ahlstroem. As we discuss below, however, we find that Backstrom is the true owner of his residence.

strom and Lindholm clearly holding the positions of authority in those entities setting policy for the group. Various subordinates occupied certain board or officer positions in name only.

### 3. Use of Same Corporate Office

All of the real estate and shipping defendants used the same common office. The Lexmar/Lexington office was located first at 635 Madison Avenue in New York City. It was relocated in 1986–87 to One Greenwich Plaza, in Greenwich, Connecticut, and thereafter was relocated once again in 1992–93 to 55 Railroad Avenue, also in Greenwich. (After Lindholm began to acquire property in Colorado, the activities of the western land defendants were also directed from the Greenwich offices of Lexmar/Lexington.[10]) Backstrom and Lindholm maintained desks at the Lexmar/Lexington offices, and regularly conducted business there.

### 4. Inadequate Capitalization of Subsidiaries

The capitalization of the shipping and real estate defendants was in virtually all instances strictly nominal, and the various entities survived almost entirely on "loans"[11] and personal guarantees. The capital of each of the shipping defendants was in almost all instances only $500.

When funds were required from time to time for chartering commitments, Lexmar Liberia was inadequately capitalized to cover them. Rather than borrow from banking institutions, however, Lexmar Liberia drew funds as needed from a common cash pool. When payments were made from that pooled account for chartering activities, Lexmar Liberia's books were debited. (Plaintiff asserts that this practice alone supports the inference that Lexmar Liberia, by itself, was not an adequately capitalized, financially viable entity to which a lending institution would extend credit in its own right.)

The real estate defendants were largely dependent on "loans" from Starlux. In addition, loans for real estate defendants were sought from and granted by banking institutions on the strength of guarantees from Lexmar Connecticut or Starlux and its shipping subsidiaries. The real estate defendants' capital was inadequate for the substantial real estate transactions in which they engaged. This is illustrated best by numerous consolidated cash flow projections, which were regularly prepared for the shipping and real estate activities of the Lexington/Lexmar Group, and which in virtually all cases reflected positive cash flow from shipping operations to be used, primarily, to support the cash needs of the real estate defendants. These real estate entities included not only Lexington Development and its subsidiaries, but also companies such as Intermobil, Robin Hill and Smokey Hill, which own the estates in which Backstrom and Lindholm reside. In sum, most of the shipping and all the real estate defendants were merely interdependent, undercapitalized subunits of a single entity, none of which could carry out its business independently of the others.

### 5. Financing of Subsidiary by Parent

The various entities within the Lexington/Lexmar Group were all financed on an as-needed basis from the other companies within the group that from time to time had positive cash flow, as is illustrated by the cash flow statements referred to above, which generally reflect a constant cash drain from the shipping defendants to the real estate defendants. "Loans" from shipping defendants to real estate defendants of approximately $52 million are discussed below, but these "loans" are mentioned here as sub-

---

**10.** Although we do not find that the western land defendants are part of Backstrom and Lindholm's single enterprise, as discussed below, we find that they are nonetheless alter egos of Lindholm personally.

**11.** Throughout this opinion, we refer to the "loans" made from one defendant to another. We quote the word "loan" to indicate our disagreement with defendants' characterization of these transfers of assets. The word loan implies an intent to repay, and we find that the transfers of assets between defendants were not made with any intent of repaying the lender. We agree with Judge Smith's finding that while many of "these transfers were characterized on the books of the defendant Starlux as 'loans' until the proverbial eve of this lawsuit, they were unsecured and never memorialized in any loan agreement." *Bergesen,* 760 F.Supp. at 983.

stantial examples of subsidiary funding with parent and sister company assets.

Most of the subsidiaries of Starlux were established each to own a single vessel. The financing of the purchase of the ships owned by these subsidiaries was on every occasion financed by or jointly with Starlux. Starlux's chartering subsidiaries, Lexmar Liberia and Star Chart (to the extent Star Chart was actually an independent corporation), were also financed by Starlux. Lexmar Liberia generally did not borrow money directly. Rather, Starlux borrowed money, and in turn financed the activities of Lexmar Liberia.[12]

In addition, Lexmar Liberia periodically entered into transactions for which it was not adequately capitalized, such as the purchase of Lexmar France and a bid for the purchase of an Argentinean shipping fleet. Such transactions would not have been possible had the funding not been provided by Starlux, and/or personal guarantees been provided. The principals of Starlux/Lexmar always treated the debts of Lexmar Liberia as group obligations [13]—at least until it became convenient to argue corporate separateness in opposition to the claims of plaintiff and other creditors.

Backstrom and Lindholm injected what they claim were personal funds into the Starlux/Lexmar entity in the period 1992–95. Those funds were used to pay various operating expenses and, according to Lindholm, also to pay creditors of Lexmar Liberia. Backstrom and Lindholm chose, however, which creditors should be paid, and decided that Plaintiff's claim should not be paid because they thought it was not "fair." In instances where Backstrom and Lindholm deemed it "fair" to settle Lexmar Liberia's claims, they took steps to make personal or group assets available for such settlements.

### 6. Parent Exists Solely as Holding Company of Subsidiary.

The shipping defendants Atlantic Brands and Starlux, and the real estate defendants Baseboard S.A. and Lexington Development, were mere holding companies for their subsidiaries. In the case of the relationship between Starlux and Lexmar Liberia, it was actually the parent that conducted the chartering activities of the nominal subsidiary, the existence of the latter company most often being ignored, or used only for accounting purposes at year end. In reports prepared for third parties regarding the "Lexmar Group," the name Lexmar Liberia does not appear (indeed there is no mention of any Liberian subsidiary), though the chartering activities of the "group" figure prominently in the reports.

### 7. Parent's Use of Subsidiaries' Property and Assets as Its Own.

Backstrom and Lindholm consistently used the property of the shipping and real estate defendants as if they were their own. This fact is best demonstrated by the massive transfers of assets from the shipping defendants to the real estate defendants over the objections of the management of the shipping defendants, but is also confirmed by numerous other transactions.[14]

---

**12.** Defendants' financial management and the overall corporate structure of their shipping business, alone, might not justify piercing the corporate veil. Indeed, plaintiff is part of a similarly structured organization, and these arrangements are popular methods of conducting business and insulating liability in the shipping industry. As is discussed below, defendants' corporate veil piercing problems stem, not from their operation of their shipping businesses alone, but rather from their combination of these businesses with their real estate businesses and personal assets.

**13.** Where convenient, defendants have argued affirmatively that the assets of the group *must* be considered as available to pay the obligations of Lexmar Liberia, as is best illustrated by the position taken by defendants in an arbitration with Stena Bulk AB ("Stena"). In the fall of 1990,

Lexmar Liberia breached most of its VLCC charter parties. However, it wished to keep the VLCC Stena Concordia (which it viewed as profitable) on charter. Notwithstanding Lexmar Liberia's desire to keep the vessel, Stena withdrew it. Stena claimed that its anticipatory repudiation of the contract was justified because Lexmar Liberia had insufficient funds to make the charter hire payment due shortly thereafter. Lexmar Liberia initiated arbitration against Stena for breach of charter, arguing that even if Lexmar Liberia did not itself have funds to pay charter hire, Starlux could and would have made the funds available to cover Lexmar Liberia's charter obligations.

**14.** An example of one particularly foolish transfer was defendants' payment to a witness in this case. In October 1996, plaintiff subpoenaed the

Plaintiffs also contend, over defendants' objections, that substantial assets of Lexmar Liberia were lent to Intermobil in 1989. While there is evidence to support this, and we find that such transfers were made, we also find that millions of dollars of Lexmar Liberia's cash assets were diverted to Starlux, which ultimately was lent to real estate defendants.

With respect to Intermobil, Robin Hill and Smokey Hill, Backstrom and Lindholm have always viewed the estate properties of these entities as their own and have treated them as such. While Backstrom and Lindholm claim to be residents of foreign countries (for tax purposes), their wives and children have lived in these homes for at least the last seven or eight years in the case of the former and the last eight years in the case of the latter. Their residence in these homes was originally not even subject to a lease agreement.[15]

Examples of Backstrom and Lindholm's use of various corporate assets as their own are too plentiful to list. The defendant corporations, without a doubt, paid for their homes, the decorating of their homes, and their cars. While we find all of these and other personal uses of various corporate assets improper, we are particularly astounded by one particularly egregious, although finan-

cially almost insignificant, example. Backstrom's wife has drawn an annual salary of $35,000 from Intermobil since at least 1989 for interior decorating of her own house.[16]

### 8. Informal Intercorporate Loan Transactions.

The evidence produced at trial provided numerous examples of informal intercorporate loan transactions, between parent and subsidiary defendant companies, between shipping defendants, between real estate defendants, and between shipping defendants on the one side and real estate defendants on the other. As a general matter, it should be noted that the finances of the shipping defendants were routed through a central agency account, or common cash pool. If a company took out more than it put in, it developed a negative intercompany liability. Conversely, if a company put in more than it used, it developed a positive intercompany liability. These intercompany liabilities were not memorialized by promissory notes, and interest on them was merely accrued, rather than regularly paid. Lindholm, in his deposition testimony, referred to this account as the "cash box."

From 1988 until the end of 1990, the profits of the shipping defendants were regularly transferred to the real estate defendants in the form of "loans."[17] Such transfers, which

testimony of William Miller, the previous controller and employee of one shipping defendant, Lexmar Connecticut. Defendants paid Miller for his services in appearing. He was paid, however, at the instruction of Lindholm, with a check in the amount of $6,745 drawn on Lexington Hotel Corporation, one of the real estate defendants for which Miller had never performed accounting services.

15. While lease agreements were subsequently prepared after alter ego suits were commenced in late 1990, rent has never actually been paid. Rather, rent has been accrued on the books of the respective companies as outstanding liabilities of Backstrom and Lindholm.

16. More financially significant is a "loan" from Starlux to an interior decorator in the amount of $4,000,000 for the interior decorating of at least one of Lindholm's homes.

17. Morten Kristiansen, who had been hired in late 1989 to manage all of the Lexmar Group, complained regularly about the diversion of the shipping companies' profits to the real estate defendants, as did Gunnar Thorvildsen, his sec-

ond in command. These complaints are well documented without reference to Kristiansen's testimony. In explaining his disagreement with Kristiansen's views, Backstrom contended at trial that it was not Kristiansen's business to say how shipping profits should be used, stating: "I have had the habit of not letting other people make decisions of my money like that."

At trial, plaintiff offered into evidence Exhibit 9004, the testimony of Kristiansen at a prejudgment remedy hearing in *Bergesen*, to document Kristiansen's repeated complaints about Backstrom's and Lindholm's conduct. Defendants objected to the admission, and we granted defendants and plaintiff leave to submit memoranda on this issue. The primary dispute regarding the admissibility of this testimony is whether plaintiff has made the required showing of "unavailability" to satisfy the hearsay exception of Rule 804(a)(5) of the Federal Rules of Evidence. While it is a close call, we sustain defendants' objection. We note, however, that Kristiansen's repeated complaints were already supported by many other documents and the testimony of numerous witnesses at trial.

ceased in or about October 1990, were booked as loans from Starlux, notwithstanding that Starlux's shipping subsidiaries (whose income was being lent) did not dividend their income to Starlux until May 31, 1991. The real estate defendants posted no security for these "loans" and no promissory notes or mortgages with respect to the loans were prepared until November 1990. Interest was merely accrued on the books of Starlux, but was neither paid nor requested to be paid.

All of the real estate defendants were the beneficiaries of such "loans." The companies that owned the Backstrom and Lindholm residences received loans directly from Starlux, while the other commercial real estate companies received funding through loans made by Starlux to Lexington Development (the parent company of most of the commercial real estate defendants). As reflected in Starlux's May 31, 1990 financial statements, the amounts thus transferred from Starlux "and subsidiaries" to related parties, excluding Lexmar Connecticut and Lexmar UK, totaled approximately $52 million as of that date.

### 9. Incorporation of Subsidiary Caused by Parent

All of the shipping and real estate defendants were formed by and at the behest of Backstrom and Lindholm. Indeed, Starlux and most of its subsidiaries were formed as part of a single transaction, pursuant to which Starlux's subsidiaries purchased a large fleet of vessels from the Spanish government. Similarly, all of the real estate defendants were formed by or at the behest of Backstrom and Lindholm, to serve as the owners or operators of various of Backstrom's and Lindholm's real estate projects. The incorporations of Lexmar Liberia on November 16, 1987, and of Star Chart on March 10, 1988, were also initiated by Backstrom and Lindholm, when the two decided to go into the oil tanker chartering business.

### 10. Parent and Subsidiary's Filing of Consolidated Income Tax Returns

The shipping defendants for the most part paid no United States taxes, by virtue of their nominal incorporation under the laws of foreign jurisdictions. Therefore, their tax returns were not consolidated. Their financial statements, however, were consolidated, both in reports entitled "Starlux Corp. and Subsidiaries" and in reports entitled "Vessels under the Management of Lexmar Corporation," the latter containing financial information concerning the same companies as included in the former, with the exception of information concerning Starlux.

The tax returns of Lexington Development and its subsidiaries, as well as the financial statements for these companies, were prepared on a consolidated basis. Indeed, the consolidated financial statements for the real estate defendants demonstrate beyond a doubt that these companies could never have survived but for the constant support of cash flow from the shipping defendants.

### 11. Decision Making for Subsidiary by Parent and Principals

Decisions for the defendant corporations were uniformly dictated from above, ultimately by Backstrom and Lindholm, and the policy behind decision-making for subsidiary companies was to benefit the group, or rather Backstrom and Lindholm, rather than to benefit the subsidiary for which decisions were being made. Nominee officers and directors played no role in corporate management or policy-setting.

### 12. Subsidiary's Directors do not Act Independently in Interest of Subsidiary but in Interest of Parent

Lexmar Liberia and its sister companies had no corporate will of their own. Decisions such as how the companies' businesses and legal disputes should be handled were controlled, without exception, by the management of Lexmar Connecticut and Starlux, that is, by Backstrom and Lindholm. The same holds true for the real estate defendants. With respect to Lexmar Liberia specifically, virtually no decision was taken that was in the financial interest of Lexmar Liberia after June 1990. Decisions with respect to Lexmar Liberia after June 1990, made by Backstrom and Lindholm, were in virtually all cases economically nonsensical viewed from Lexmar Liberia's perspective, and served only the interests of the alter ego

generally, and Backstrom and Lindholm specifically.

### 13. Contracts Between Parent and Subsidiary that are More Favorable to Parent.

Lexmar Liberia and Star Chart each had management agreements, as did the remaining shipping defendants, with Lexmar Connecticut. The benefits of the financial activity of Lexmar Connecticut flowed to Backstrom and Lindholm, notwithstanding that the shares of the company were nominally held by a third party. Lexmar Liberia and Star Chart paid substantial management fees to Lexmar Connecticut, which certainly benefitted the latter more than the former, and which resulted in substantial benefits to Backstrom and Lindholm.

### 14. Nonobservance of Formal Legal Requirements.

Defendants went to great lengths to set up several layers of corporations. With the assistance of very capable legal and accounting professionals, some of the formal legal requirements for corporations were observed. As discussed above, however, when the independent nature of separate corporations caused Backstrom and Lindholm inconvenience, the corporate fiction was completely disregarded.

One example of inattention to formal legal requirements in the operation of the defendants' business entity is the commingling of the accounts of Lexmar Liberia with those of its sister company, Star Chart. While defendants claim that Star Chart was merely an accounting identity for various Lexmar Liberia activities, plaintiffs assert that Star Chart was created and used for improper purposes. We will not discuss in depth these allegations, but note that this is one instance where defendants did not even give token recognition to independent corporate existences.

Another example of the nonobservance of formal legal requirements is the treatment of the substantial compensation of Morten Kristiansen (which was in excess of $1 million per year). According to the terms of a written offer of employment, which was personally drafted and provided to Kristiansen by Backstrom, Kristiansen was hired to be "the new President of the Lexmar Group."[18] Kristiansen became chief executive officer of all of the Starlux/Lexmar shipping companies, and all of the employees of Lexmar Connecticut, the managing entity for the shipping defendants, reported to him. Kristiansen was named the president of Lexmar Liberia on September 1, 1989, and served merely as a board member of the other shipping defendants on whose behalf he performed services.

Despite Kristiansen's involvement with all the shipping companies, Starlux paid Kristiansen's compensation, while Lexmar Connecticut paid his travel and entertainment expenses and financed his housing. Kristiansen resigned from his position on October 16, 1990, three days before the initiation of the underlying action in this lawsuit. On December 5, 1990, Claes–Johan Geijer, the shipping defendants' chief financial officer, instructed William Miller, the Lexmar Connecticut controller, to make sure that he charged 100% of Kristiansen's compensation to Lexmar Liberia.

---

**18.** The terms of this offer were quite lavish, and included:

1. MK [Morten Kristiansen] is given sufficient funds to buy [a particular] house in Greenwich, Connecticut, USA and to "cosmetize" this house in a nice way that has to be approved by MK's wife. These funds are given to MK up front with no obligation to pay them back.

2. MK is guaranteed a salary of $1,000,000 per annum, paid monthly in advance.

3. MK is to receive an "incentive" of 10% on all deals calculated from the time when he starts. The calculation of the "incentive" shall be made on the "net profit" which means that the equity shall be reimbursed with an imputed interest of LIBOR plus 2% before the base of the 10% is calculated. If Lexmar decides to terminate the employment before 1995, MK will receive a lump sum severance payment of $2,000,000.

4. Lexmar will reimburse MK for his moving costs from Norway to the United States.

5. MK will have the right for himself as well as his wife and children to fly first class world-wide at his convenience.

6. MK will be the President of the Lexmar Group with full authority to reorganize the whole group, subject to the approval of the board, which in reality is Adam Backstrom and Magnus Lindholm.

¢

8. MK will have the right to the use of two free corporate cars.

9. MK will have a free expense account.

### 15. Conclusion Regarding Domination and Control

As perhaps too exhaustively explained above, we find *Kirno Hill* properly states the law governing plaintiff's attempts to pierce defendants' various corporate veils: plaintiff must either prove (1) control and domination or (2) fraud or some other inequity. We discuss fraud below, but here conclude that plaintiff has sufficiently proven domination to permit the piercing of all the real estate and most shipping defendants' corporate veils.[19] Echoing the *Kirno Hill* language, defendants Backstrom and Lindholm have so dominated and disregarded their real estate and shipping corporations' corporate forms that we find that corporations primarily transacted the defendants' personal business rather than their own corporate business. While the corporate form should generally be recognized, we see no reason to respect a fiction that has been so blatantly disregarded by the defendants. We therefore find that all real estate [20] and almost [21] all shipping defendant corporations are merely alter egos of defendants Backstrom and Lindholm personally, and that plaintiff is entitled to recover its judgment against Lexmar Liberia from any or all of these defendants or from Backstrom and Lindholm personally.[22]

Included as one of these corporations whose veil we now pierce is Intermobil. We completely reject defendant Ahlstroem's purported interest in it. Backstrom and Ahlstroem [23] assert that, as friends since boyhood, they have a history of doing business together without any documentation. While this may well be true, we also find that Backstrom has a history of falsely asserting Ahlstroem's name as owner of different interests, when convenient for a variety of different purposes.[24] Not surprisingly given his other

19. Defendants argue that plaintiff is estopped from denying Lexmar Liberia's separate corporate identity since, in the arbitration between plaintiff and Lexmar Liberia, plaintiff argued that Lexmar Liberia's corporate officers had actual and apparent authority to contract on its behalf. Plaintiff apparently made this argument at the arbitration in opposition to Backstrom and Lindholm's claim that Morten Kristiansen, the president of Lexmar Liberia, did not have authority to bind Lexmar Liberia.

Defendants now argue that it would be inequitable and unfair to allow plaintiff to now deny the very corporate form upon which it relied, successfully, in the arbitration to establish its claim against Lexmar Liberia. *See Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1037 (2d Cir.)("[t]he doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding"), *cert, denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). We disagree, and find that plaintiff does not advance inconsistent arguments. Regardless of whether Lexmar Liberia was a legitimate corporate entity, Kristiansen was clearly defendants' agent. Kristiansen was given the title of president of Lexmar Liberia. Arguing that the asserted president of a business had authority to bind that business is not inconsistent with an assertion that this business was not a legitimate independent corporation, since it was fraudulently dominated and controlled by others.

20. The real estate defendants are: Baseboard, Lexington Development, 145 East 32nd Street, Valhalla Swedish Associates, Lexmar Delaware, Old Road Development, Eagle–Hus, Eagles Management, Lexington Construction, Lexington Building Systems, 820 Riverside Drive, Harbor Hospitality, Lexington Hotel, Robin Hill, Smokey Hill, Intermobil, and Crown Estates.

21. The shipping defendants are: Cohort Trust, Atlantic Brands, Starlux, Gunvor, Eastgate, Lexmar Espana, Lexmar Do Brasil, Lexmar Liberia, Star Chart, E–B, Sea Traveler II, Mid–Atlantic, Lux Challenger, Lux Rig, Greater Southampton Enterprises, Lexmar France, Lexmar Connecticut, Pullman, Lexmar Norge, Almendro, Magnolio, Naranjo, and Nogal.

The only shipping defendants that we do not find are alter egos of Backstrom and Lindholm are Erwin and its wholly owned subsidiary, Lexmar UK. Defendants assert that Erwin is wholly owned by parties unrelated to the other defendants. However, we note that both of these defendants have defaulted.

22. As is discussed below, we also pierce the corporate veils of various other entities. We discuss these issues below, however, since, unlike the various corporate defendants discussed here that are all part of the single enterprise run by Backstrom and Lindholm, these other entities were fraudulently created for Lindholm personally.

23. Ahlstroem is the only appearing defendant who was represented by counsel different from counsel that represented Backstrom and Lindholm and their various companies.

24. Backstrom and Lindholm have made a regular practice of using numerous straw men and dummy corporations whenever convenient to

actions, when faced with the prospect of personal liability, Backstrom attempts to insulate his home. Towards that end, Backstrom asserts that Ahlstroem controls Intermobil and that Ahlstroem has major mortgages on Intermobil's asset (Backstrom's residence). We completely credit, but do not iterate here, all of plaintiff's evidence in this regard. Ahlstroem's purported interest in Intermobil is a sham, and Intermobil is the alter ego of Backstrom.[25]

### B. Fraud or Inequity

■ While there is no legal or equitable reason for requiring plaintiff to prove fraud or inequity before we pierce defendants' corporate veils, we nonetheless note that plaintiff has fully proven fraud or inequity.

### 1. The $52 Million Dividend

As set forth above, most of the shipping and all the real estate defendants within the Lexmar/Lexington organization were in fact run as a single entity, with cash transferred or "loaned" indiscriminately from "shipping" to "real estate" over a period of several years, during which time no written loan documentation and no security instruments were ever prepared. These loans included multi-million dollar transfers to Lexington Development as well as to Lindholm personally and to those defendant corporations which are the owners of the estates in Greenwich beneficially owned by Backstrom and Lindholm. According to Starlux's financial statements, the total of such undocumented and unsecured "loans" from shipping to real estate totaled some $52 million by May 31, 1990, an increase of some $25 million in the year since May 31, 1989 alone.

When hard times struck in the fall of 1990, the accounts receivable of $52 million were not made available to the creditors of Lexmar Liberia or of any other Starlux/Lexmar shipping companies, but instead were retroactively "dividended" to Starlux's parent, Atlantic Brands, in an effort to ensure that none of the shipping entity's creditors would have access to them. The dividend included, but was not limited to, accounts payable to Starlux by Intermobil (over $12 million), Robin Hill (over $6.6 million), Lindholm, sub nom. David Collins (Lindholm's interior decorator) (over $4.8 million), Smokey Hill (over $487,000) and Crown Estates (over $552,000). The dividend, which defendants claim was declared on June 20, 1990, was in fact not effected until late October 1990, and was effected with actual intent to delay and hinder creditors.

Defendants have produced an undated document which they contend is a board resolution of Starlux, which purports to memorialize the results of a board meeting "held on June 20, 1990." According to this document, it was at that meeting that Backstrom and Lindholm, acting on behalf of Starlux, dividended the $52 million in question, and did so "as of" May 31, 1990. The document is obviously falsified, and otherwise inadequate evidence to support defendants' contention that the dividend was effected on the date of the ostensible June 20, 1990 board meeting. Although Lindholm initially asserted in absolute terms that he actually met with Backstrom in Greenwich on June 20, 1990, he changed his story when confronted with the fact that he was not even in the United States on that date. The document, in addition to describing a fictitious board meeting, is also fundamentally flawed in form,[26] and

---

avoid legal obligations and prohibitions. Most notable, Backstrom and Lindholm have successfully avoided tax liabilities while at the same time earning millions of dollars. Indeed, Backstrom's fraudulent assertion that Ahlstroem owns Intermobil was likely initially developed in order to avoid tax liability that would have resulted if Backstrom owned Intermobil personally.

25. While we find that Ahlstroem has no interest in Intermobil, we cannot help but comment on our disagreement with plaintiff's argument that Ahlstroem's absence at trial (although he did have an attorney occasionally there) is somehow

evidence of this lack of interest. Plaintiff itself had no corporate representative present in Court during any stage of this litigation.

26. The document, purporting to record a Starlux board meeting, is signed by Backstrom and Lindholm under the heading "Atlantic Brands Corp." Lindholm contended that he had signed the document in his capacity as an Atlantic Brands shareholder. He further claimed that dividends in Sweden are declared by corporate shareholders, and that he did not realize that the board performs this function in the United States. Backstrom, unlike Lindholm, claimed

reflects corporate action which, had it been taken in fact, would have been in direct contravention of Starlux's bylaws, since no notice of a meeting had been given to all Starlux directors.[27]

On October 23, 1990, four days after Plaintiff commenced the instant litigation, Miller, Starlux's own comptroller, was first informed that the $52 million in accounts receivable had been "dividended" by Starlux. Miller then told the outside accountants for both the shipping and real estate defendants, Lopez Edwards, who, like Miller, had never previously heard of any such dividend.[28]

We find that the dividend was part of a plan to remove assets from the Starlux/Lexmar entity in October 1990, so as to keep them out of the hands of creditors. In this connection, it is no coincidence that Miller first learned of the dividend on October 23, 1990, since it was on the previous day, October 22, 1990, that Lexmar Liberia (Backstrom and Lindholm) resolved to wind up the company's affairs. Mortgages securing the dividended accounts receivable were recorded on November 14, 1990. Thereafter, the same accounts receivable, with the mortgages securing them, were further dividended by Atlantic Brands on January 2, 1991 to Backstrom and Lindholm personally (with Backstrom also personally taking the 45% that should have gone to Cohort Trust).[29]

### 2. The Filing of Mortgages on November 14, 1990

Shortly after the $52 million dividend was declared in late October 1990, mortgages were registered on November 14, 1990 on the properties in Greenwich belonging to the real estate defendants. These mortgages secured not only debts previously payable to Starlux (and now for the most part payable to Atlantic Brands), but also other unsecured and undocumented obligations, which were ostensibly payable by the real estate defendants to other insiders, including various real estate defendants and Lindholm personally.

Even those mortgages which the defendants claimed at the *Bergesen* hearing were in favor of third parties, were in reality in favor of insiders. Lindholm conceded that he personally had the beneficial interest in mortgages nominally in favor of his Swedish friends, Frederic Roos and Jan Nordlinder.[30] Defendants not only encumbered their property on November 14, 1990 in an effort to defeat the claims of creditors, they also sought to conceal the fact that the encumbrances were in all cases in favor of insiders.

that he signed the purported board minute in his capacity as a Starlux board member.

**27.** Kristiansen, who was the third director of Starlux, did not sign the purported June 20, 1990 board resolution. Lindholm acknowledged that no notice of a meeting had been given to Kristiansen, and also acknowledged that no dividend had been discussed with him. Lindholm nevertheless maintained that there had been a meeting, to which Kristiansen had not been invited because "[h]e didn't own the company so he didn't really have anything to do with this. It was a private matter." For his part, Backstrom also maintained that there had been a meeting but that Kristiansen was not informed of it because "we knew he was opposed to it," and "we knew what he was going to say."

**28.** This is consistent with Backstrom and Lindholm's practice of making and effecting major financial transactions behind the backs of their accountants and financial advisors, when they knew such transactions were improper.

**29.** At the time of the dividend, the ship owning subsidiaries of Starlux had not even dividended to Starlux their earnings on ship sales. That did

not occur until May 31, 1991. Thus, Starlux owed some $66.5 million to its ship owning subsidiaries alone, and had total liabilities of $97.3 million against total assets of $29.4 million at year end May 1991—the same year in which Starlux had declared a $52 million dividend. In sum, the dividend of $52 million rendered Starlux insolvent on an unconsolidated basis.

**30.** The mortgage in the amount of $200,362 from Smokey Hill to Frederic Roos, the separate mortgage in the amount of the $4,360,178.60 from Robin Hill to Frederic Roos, and the $4,133,100 mortgage from Robin Hill to Jan Nordlinder, have all since proven to have been for the personal benefit of Lindholm. In the case of Roos, the mortgages in fact secured "loans" directly from Lindholm to Robin Hill and Smokey Hill (the companies owning his private residence). Although one of defendants' witnesses testified in the *Bergesen* hearing that the mortgage in fact reflected a bona fide debt to Roos, this was clearly incorrect. The mortgage in favor of Roos on the Robin Hill property was later negated when Lindholm's lawyers in 1992 explained to the estate of the then-recently-deceased Roos that the whole thing had been a cover for transfers to Robin Hill by Lindholm.

### 3. Alleged Fraudulent Transfers

The alleged fraudulent transfers of interests in defendants' assets are discussed below, as causes of action separate from plaintiff's alter ego claim. These "transfers" should also be considered, however, in connection with an inquiry into fraud or inequity relating to plaintiff's alter ego claims.

Many of the interests allegedly transferred represent the same accounts receivable and mortgages transferred by the defendants in late October 1990 as part of the $52 million dividend. Many nominal transfers were intended merely to place assets one step further from the grasp of legitimate creditors of the Starlux/Lexmar entity, including the creditors of Lexmar Liberia. Perhaps more significant, the manner in which mortgage interests ostensibly belonging to various defendants could be so easily and simultaneously manipulated in order to defeat creditors' claims, adds extra weight to plaintiff's arguments that both the mortgagees (such as Lindholm and Atlantic Brands) and mortgagors (such as Smokey Hill, Robin Hill and Intermobil) in these transactions must be considered as alter egos of one another, all acting for the benefit of Backstrom and Lindholm.

### 4. Lexmar France

Lexmar France was a French company, formed in late 1989 or early 1990 to obtain the concession to reactivate and operate the inactive La Ciotat Shipyard in Marseille. The project, which had been viewed as potentially quite lucrative, foundered in the spring and summer of 1990, when the responsible French authorities were apparently informed that if the yard were permitted to reopen, it would be necessary for the government to repay huge sums to the European Economic Community, which had earlier provided substantial economic assistance to the Marseille area in order to alleviate the hardships originally caused by the closing of the yard. Ultimately, the project was scrapped as a result of this political impasse.

Notwithstanding defendants' contention that Lexmar Liberia was never profitable and thus had no available capital with which to make loans to real estate companies, defendants maintain that the decision was made in early 1990 to make Lexmar France a subsidiary of Lexmar Liberia. This decision in itself bears directly on the alter ego question. The initial investment in Lexmar France of some $4.4 million clearly could not have been made without financing from Starlux. Starlux did in fact provide the capital for this project, which Lexmar Liberia was not itself adequately capitalized to handle, and this resulted in a $4.4 million increase in Lexmar Liberia's intercompany liability to its parent.

Neither plaintiff nor any other business partner of Lexmar Liberia could possibly have been expected to know of the potential risks Lexmar France posed to Lexmar Liberia when Lexmar personnel were not even aware that Lexmar France was a Lexmar Liberia subsidiary. Lexmar France, like the other companies in the Starlux/Lexmar entity, was run from the offices in Greenwich, and little attention was paid to who owned it until it became a money-losing venture.

Regardless of which entity was Lexmar France's owner, it is undisputed that Starlux lent some $3.4 million to the company over the first months of its existence (this sum being in addition to the $4.4 million initial investment described above). It is also undisputed that invoices to Lexmar France from the Connecticut office were always sent, in the period prior to July 31, 1990, from Starlux or Lexmar Connecticut and not from Lexmar Liberia. After it became clear that the Lexmar France investment was a bad one, however, the $3.4 million in bad debts, previously payable by Lexmar France to Starlux, were transferred by Starlux to Lexmar Liberia. The transfer involved the preparation of dummy invoices, backdated so as to make it look as if certain of the loans had been made by Lexmar Liberia in the first instance, which was not the case.

The transfer of these bad debts from Starlux to Lexmar Liberia increased Lexmar Liberia's intercompany liability to Starlux even further, by several million dollars, for a total (comprising the initial $4.4 million investment plus subsequent loans) of some $8 million. When Lexmar Liberia was forced to write off the Lexmar France investment in

mid 1991, however, its intercompany liability to Starlux remained unchanged. Accordingly, of the multi-million dollar intercompany liability that Lexmar Liberia carried toward Starlux in the period 1991–95, several million dollars were attributable to the wrongful dumping of Lexmar France's bad debt into Lexmar Liberia, debt which in the normal course of events should have been written off by the party that made the loans—Starlux.

Under French law, corporate shareholders may be held liable for the difference between a corporation's stated capital and the amount of capital actually paid in. Also potentially liable for such amounts are those who have served as "de facto managers" of a French company. Lexmar France had stated capital of 100,000,000 French Francs, of which as of June 1990 only some FF 25,000,000 had been paid in. Backstrom was aware of the risk that this FF 75,000,000 shortfall posed to him personally, and advice was solicited and provided on various occasions concerning the danger that the French authorities might seek to impose liability upon him or others within the Starlux/Lexmar entity in connection with the Lexmar France investment. The transfer of the aforementioned bad debts from Starlux to Lexmar Liberia was part of a plan to increase Lexmar Liberia's paid in capital in Lexmar France (by converting the debt to equity), with the intention of closing the gap between the amount of authorized and paid in capital, for the purpose of insulating Backstrom and others from personal liability.

The transfer of bad debt to Lexmar Liberia served the interests of Backstrom and the Starlux shipping entity as a whole but were not in the interests of Lexmar Liberia, and indeed would have been wholly contrary to Lexmar Liberia's interests if Lexmar Liberia had been a bona fide independent corporation.

### 5. Asset Stripping from Lexmar Liberia after the Contract with Plaintiff

In the period after Lexmar Liberia and plaintiff entered into contractual relations, huge management fees were paid by Lexmar Liberia to Lexmar Connecticut, and the payment of such fees continued through 1994, notwithstanding that Lexmar Liberia had no ships on charter after 1990, and was listed as "inactive" in financial statements for the period ending May 31, 1991. The total of such payments was some $2.7 million. This was not justified by Lexmar Liberia's business activities in the 1991–94 period, and is proof of the stripping of the company's assets for the benefit of its corporate parent.

In addition to paying unwarranted management fees to Lexmar Connecticut, Lexmar Liberia also made numerous transfers of assets on behalf of sister companies, and entered into various financial transactions for the benefit of its sister and parent companies in the 1991–1994 period, which were contrary to the business interests of Lexmar Liberia and which resulted in the squandering of assets of the insolvent Lexmar Liberia, to which creditors such as plaintiff should otherwise have had access.

For example, Lexmar Liberia had at least one restricted cash account, in which some $1.6 million was held pending the outcome of arbitrations with the owners of the vessels STENA CONCORDIA and VIDA I. A further $700,000 was maintained in escrow pending outcome of the VIDA I arbitration. All of these amounts were ultimately released to Lexmar Liberia. Some $900,000 of the restricted funds were released to Lexmar Liberia in May 1993, and were applied to cover obligations of Lexmar Liberia's sister companies, Eastgate and Lexmar Espana, and to make other payments to the Royal Bank of Scotland in connection with loans to entities other than Lexmar Liberia. When the remaining $1.4 million was released to Lexmar Liberia in 1994, those funds were paid to Starlux, in partial satisfaction of the intercompany liability owing to Starlux from Lexmar Liberia.

Along similar lines, on or about May 19, 1993, Lexmar Liberia signed guarantee agreements in favor of the Royal Bank of Scotland, with respect to new loans being advanced to certain of Lexmar Liberia's sister companies. In support of these guarantees, which subjected Lexmar Liberia to some $23 million in new potential liability, Lexmar Liberia assigned to Royal Bank of Scotland the proceeds of an arbitration between Lexmar Liberia and Stena

Bulk AB. This was done notwithstanding the fact that plaintiff, as was known to the defendants, was in the process of attaching the same assets as security for its claim against Lexmar Liberia in connection with the INDEPENDENCE charter party. The funds assigned, ultimately valued at some $1.25 million, were in addition to the $2.3 million described in the preceding paragraphs.

There are other examples of improper diversions of funds from Lexmar Liberia in this period, including Lindholm's use of Lexmar Liberia funds to purchase airline tickets for himself and his family for a trip to Colorado.[31]

Lexmar Liberia's intercompany liability to Starlux, which had skyrocketed initially by virtue of the Lexmar France transaction, rose steadily through 1995 to a figure well over $20 million. During 1991–95, interest alone was accruing on the intercompany liability at over $1 million per year. As the preceding paragraphs demonstrate, whenever assets of Lexmar Liberia became available, they were used in partial satisfaction of that obligation to Starlux and, notwithstanding Lexmar Liberia's insolvency, were not made available to bona fide third party creditors.

#### 6. withholding of Documents

Below, we discuss and reject plaintiff's separate claim for fraudulent nondisclosure. The same evidence which we find to be insufficient to permit recovery below, however, is legitimate evidence of defendants' fraud and the resulting inequity. Plaintiff has proven that it was the victim of the withholding of critical documents during the early stages of the litigation of this matter. While we are unable to determine who intentionally withheld these documents, we find that these documents were intentionally withheld by defendants or their agents. The withholding of these documents successfully delayed plaintiff's efforts to obtain a judgment, allowing defendants the time to strip assets as described above, thus ensuring that any judgment plaintiff might obtain would be unenforceable as against Lexmar Liberia.

#### 7. Conclusion Regarding Fraud or Inequity

While we have already held that plaintiff need not prove fraud or inequity to justify piercing defendants' corporate veils, plaintiff has nonetheless amply proven such fraud or inequity with the examples discussed above. It would be highly inequitable to permit defendants' to shield themselves from liability when they have so clearly dominated and controlled their corporations with the intention of defrauding creditors, including plaintiff. *See generally Alford v. Frontier Enterprises, Inc.,* 599 F.2d 483, 484 (1st Cir.1979)(shareholder may not "use the corporate form both as a shield and sword at his will"). We therefore find that defendants' have used their control to "commit a fraud or other wrong that cause[d] plaintiff's loss." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir.1991); *accord American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.) ("such domination must have been used to 'commit fraud or wrong' against plaintiff") (citation omitted); *Brunswick Corp. v. Waxman,*[32] 599

---

**31.** The $1,752.50 used for the airline tickets may be financially insignificant in comparison with the sums involved in this case, but the transaction is nevertheless another example of the fact that Backstrom and Lindholm always viewed Lexmar Liberia as a petty cash box whose corporate form was of no importance.

Transfers were also made by Lexmar Liberia in the 1991–95 period to Oak Trading, a Channel Islands Corporation under the ownership of a Mr. Lindgren. Tens of thousands of dollars were paid to Mr. Lindgren, a chartering specialist, in a time when Lexmar Liberia had no vessels on charter, and notwithstanding that Mr. Lindgren's work was for the most part performed in connection with a sister company, Lexmar Espana and its subsidiaries.

In addition, numerous minutes from the 1991–95 period reflect that Lexmar Liberia continued to take on new obligations supporting the obligations of sister companies to various lending institutions, at a time when Lexmar Liberia, by defendants' presentation of the facts, was in no financial position to honor those commitments.

**32.** Defendants have relied heavily on *Brunswick* throughout this litigation. As they describe the case, the key to the Court's decision was that plaintiff knew when it entered into the contract that it was dealing with a privately held, thinly capitalized corporation that defendants were purposely using to avoid their own direct liability in the transaction. The Second Circuit held that such a plaintiff cannot rely on an alter ego claim

F.2d 34, 36 (2d Cir.1979)("What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result.") (quoting Latty, Subsidiaries and Affiliated Corporations 191 (1936)). Even if there was a requirement of proof of fraud, therefore, we find that plaintiff has fully satisfied it.

## III. BAD FAITH BREACH OF CONTRACT

■ In its complaint, plaintiff brings a claim of bad faith breach of contract, arguing that defendants are liable for their bad faith breach of the underlying charter party. We find that plaintiff may not recover on this claim.

This claim rests on the original oral charter party which was found to have an arbitration provision, and which was arbitrated. Plaintiff has already recovered a judgment on this underlying contract, and the principles of *res judicata* bar it from bringing another claim based on the same contract here. *See In re Teltronics Services, Inc.,* 762 F.2d 185, 193 (2d Cir.1985) ("[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata").

## IV. FRAUDULENT NONDISCLOSURE

■ Plaintiff also brings a claim of fraudulent nondisclosure, seeking to hold defendants Backstrom, Lindholm, and Lexmar

Liberia liable for Lexmar Liberia's failure to produce relevant documents requested during discovery in the Southern District of New York litigation before Judge Sprizzo. We discussed at some length the legal sufficiently of these claims in a prior decision, *see* 934 F.Supp. 33, 39–41 (D.Conn.1996), and do not repeat that discussion here.

We agree with plaintiff's assertion that the disputed documents should have been produced to it in 1990 and 1991, pursuant to discovery requests. These documents are very probative evidence of Lexmar Liberia's liability to plaintiff, and we find that if they had been produced pursuant to the original discovery requests, the New York litigation would have been significantly curtailed. We further find that the arbitration award would have been issued significantly earlier, and would have been confirmed earlier, had the defendants disclosed these documents, thereby reducing the time and expenses involved in the New York litigation. Finally, we find that Lexmar Liberia might have been financially capable of satisfying at least part of the judgment had the arbitration award been confirmed prior to Lexmar Liberia's insolvency.[33]

Despite these findings, plaintiff has failed to prove its fraudulent nondisclosure claims. While recognizing that Backstrom and Lindholm, as alter egos of Lexmar Liberia, had a duty to comply in good faith with the document requests, we find that they delegated this duty to others and therefore did

to avoid the consequences of a deal it knowingly accepted. While we agree with defendants' description of the case, we find its reasoning has no applicability here.

First, as we have already noted, *Brunswick* dealt with the application of New York law. Even if that law were applicable, however, our case is easily distinguishable. Frederiksen, the owner of plaintiff Northern Tankers, was indeed a sophisticated businessman with experience in the shipping industry. Frederiksen is also likely familiar with the type of corporate structure utilized by defendants to insulate themselves and their various businesses from liability. There is no proof, however, that Frederiksen knew, when plaintiff and Lexmar Liberia entered into their contract, that defendants were completely controlling and dominating Lexmar Liberia for their own personal use. There is also no evidence that Frederiksen knew that defendants used their var-

ious corporate structures as a method of defrauding creditors and evading taxes.

The ultimate holding in *Brunswick* was that the corporate veil should be pierced only if necessary to reach an equitable result. The Court therefore found that the veil should not be pierced since the plaintiff understood when making the contract that the contract was with a thinly capitalized corporation. In contrast, we find it would be highly inequitable to permit defendants to hide behind their various corporate veils. Absent proof to the contrary, we will not assume plaintiff knew that it was dealing with a corporation whose independent existence was completely ignored, often for fraudulent purposes.

**33.** Of course Backstrom and Lindholm might well have responded to an earlier judgment by stripping Lexmar Liberia of all its assets by an earlier date.

not accept personal responsibility for compliance with the discovery requests. *See* 934 F.Supp. at 40 ("we ... hold that when corporate officers accept responsibility for compliance with discovery requests and fraudulently refuse to disclose specific documents, they may be held personally liable for fraudulent nondisclosure."). While there was evidence that Backstrom and Lindholm were asked to search their personal records, there was insufficient evidence that either Backstrom or Lindholm played a significant role in complying with the discovery requests. In light of their lack of involvement with discovery compliance, we decline to draw the inference that they personally and intentionally withheld relevant documents.

As discussed above, we find that the documents were intentionally withheld by someone. In order to hold Lexmar Liberia liable for its agent's intentional tort, however, we must further find that the agent committed the tort within the scope of his or her employment and in furtherance of Lexmar Liberia's business. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995)("Under New York law, the doctrine of *respondeat superior* renders an employer vicariously liable for a tort committed by an employee while acting within the scope of his employment. However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business.") (citations omitted).[34] While one of Lexmar Liberia's agents likely fraudulently withheld the documents within the scope of his or her employment, plaintiff has failed to prove that this tort was committed in furtherance of Lexmar Liberia's business so as to make Backstrom and Lindholm responsible for their alter ego.

## V. FRAUDULENT TRANSFERS

Plaintiff makes allegations of various fraudulent transfers. As we have already found that most of the corporate defendants are alter egos of Backstrom and Lindholm's shipping and real estate enterprise, and that such entities have no separate existence, any fraudulent transfers between Backstrom, Lindholm and their alter egos were merely nominal changes of ownership with no actual transfer being made. If we were to view any of these defendants as independent, however, the transfers to them would clearly constitute fraudulent transfers pursuant to at least one section of the Uniform Fraudulent Transfer Act, adopted by both Colorado[35] and Connecticut, Colo.Rev.Stat. § 38–8–105(1)(a) and Conn. Gen.Stat. § 52–552e(a)(1). These sections mandate the voiding of transfers made with actual intent to hinder, delay, or defraud any creditor of the debtor. Backstrom and Lindholm made all of the disputed transfers with the intent of shielding their assets from existing creditors.

One improper "transfer" involved a mortgage in favor of Atlantic Brands on property owned by Intermobil at 30 Crown Lane in Greenwich, Connecticut. This mortgage was allegedly transferred to Ahlstroem on April 8, 1993. Although Ahlstroem is an actual person, we reject any assertion regarding his purported ownership of this mortgage of any other interest in any of the defendants. As discussed previously, Ahlstroem's name was used, as convenient, to mask ownership by Backstrom. Therefore, while Ahlstroem individually is not an alter ego of Backstrom and Lindholm, but rather a "straw man," we find that this and any other purported transfer to or from Ahlstroem was a complete fraud. We therefore likewise reject any current purported ownership of Ahlstroem in any of the defendant corporations, including alleged mortgages on any property owned by defendants.

Similarly, Lindholm has purportedly transferred mortgages on Robin Hill and Smokey Hill to Finance Generale, a corporation nominally owned by Lindholm's wife. Finance Generale was set up specifically for the pur-

---

**34.** As we held in our prior decision, 934 F.Supp. at 37–39, plaintiff's fraudulent nondisclosure claim is a state-law cause of action subject to supplemental jurisdiction under 28 U.S.C. § 1367. As such, applying Connecticut's choice-of-law rules, we held that New York law should govern this claim.

**35.** Colorado law is relevant to the fraudulent transfers that occurred between Lindholm and the western land defendants.

pose of receiving fraudulent transfers and defrauding creditors, and has at all times been completely controlled and dominated by Lindholm. Its independent corporate existence is therefore appropriately disregarded under any of the tests of corporate veil piercing discussed above.[36] We therefore do not find that any purported transfers to Finance Generale must necessarily be described as fraudulent transfers, since ownership never changed hands, but rather remained at all times within the control of Lindholm.[37] To the extent Finance Generale might be considered a legitimate entity, however, any transfers to it were performed with the intent of hindering existing creditors, and therefore would constitute fraudulent transfers.

The remaining fraudulent transfers relate to the western land defendants—Lava, Alkali, Piney, EMD, Eagle Mountain, and Stark Creek. These defendants are a group of entities which own substantial real and personal property in Colorado. They were not directly part of the large enterprise operated by Backstrom and Lindholm, but rather were Lindholm's separate personal investments.

Piney [38] is currently the owner of Colorado real estate likely worth in excess of $100 million. Piney also owns 85% of EMD, which in turn owns millions of dollars worth of additional Colorado real estate. The remaining 15% of EMD is owned by Peachtree. From the formation of Piney on March 20, 1990 until December 31, 1992, Lindholm held the grantor's rights in Piney in his own name, and thus was the beneficial owner of the substantial real estate the trust and EMD possessed.

On December 31, 1992, Lindholm transferred his grantor's rights in Piney to Lava, as a contribution to capital. Lava had been formed on or about December 29, 1992, with a paid in capital of $1,000, all of the company's 1,000 shares being owned by Lindholm. On the same day, Lava transferred the Piney grantor's rights to Alkali, also as a contribution to capital, the agreed net value of the transfer being set at $404.

Alkali is a limited partnership, whose general partner is Lava, and whose limited partners, which purportedly own 99% of the partnership assets, are four trusts established for the benefit of Lindholm's children. Lava purportedly owns only 1% of the Alkali partnership assets, but has the right to become a limited partner. Lindholm exercises complete control over Lava by virtue of his ownership of 100% of the shares and in his role as president and secretary of the company. He exercises complete control over Alkali, by virtue of the terms of Alkali's partnership agreement, which *inter alia* states that the

---

**36.** We completely reject Lindholm's claim that the transfers of mortgages were assigned to Finance Generale as security for a $10 million obligation Lindholm had to his wife, which resulted from a bank error he discovered on a visit to Switzerland to a Swiss bank in December 1992. Although a creative assertion, we find Lindholm's testimony regarding such an obligation untrustworthy. We also reject any assertion that Finance Generale existed for a purpose other than attempting to shield Lindholm's assets from his creditors. Of all the testimony at trial, the assertions regarding the legitimacy of Finance Generale were perhaps the most disingenuous, since they appear to not have even a basis in truth.

**37.** Interestingly, the nominal ownership of Finance Generale has changed several times. Although it is now again purportedly owned by Kerstin Lindholm, for a time, most of it was allegedly owned by Ahlstroem. Backstrom and Lindholm are obviously imaginative in their dishonesty.

**38.** Although Piney is not an alter ego of the entire shipping and real estate enterprise, Piney's

affairs have been intermingled with the finances of the shipping defendants. Indeed, money was borrowed for Colorado land purchases under the aegis of the shipping defendants. Moreover, the earnings of the shipping company subsidiaries of Starlux are now being used indirectly by Lindholm to take the monetary benefits of his property acquisitions and development activities in Colorado. Essentially, Lindholm has sought to arrange for the sheltering of some $7 million in Colorado income by having the company, 260 Peachtree Street, purchase 15% of EMD. Peachtree, a subsidiary of Baseboard, had received some seven million dollars from Starlux as of May 1990 (part of the $52 million in "loans"). That obligation was dividended to Atlantic Brands and ultimately to Backstrom and Lindholm in early 1991. Thus, in late 1994 or early 1995, when Lindholm purchased Peachtree from Baseboard for a nominal sum, Peachtree still had an outstanding liability of some $7 million, and that liability remained, payable to the Lindholms, when Lindholm sold Peachtree to his wife on February 17, 1995.

limited partners shall have no role whatsoever in the management of Alkali, all powers being in the hands of the general partner, Lava, including the power to dispose of all trust assets.

Lindholm's transfer of his Piney grantor's rights was directly related to the initiation of litigation by Gamlestaden AB, a major lender to the Starlux/Lexmar Group to which Backstrom and Lindholm had each given personal guarantees. That litigation threatened Lindholm's personal assets, and the transfer was intended to place assets beyond the reach of Gamlestaden and other creditors (including plaintiff, whose litigation was also proceeding against Lexmar Liberia at the time of the transfer [39]). We find that Lava and Alkali were created specifically for the fraudulent purpose of shielding Lindholm's assets from his creditors, and we therefore completely disregard their corporate existence. Lava and Alkali are alter egos of Lindholm, and any judgment against Lindholm may be collected against Lava, Alkali, or any of their assets. In light of this finding, Lindholm obviously has not actually transferred his Piney grantor's rights.

If we were to view Lava and Alkali's existence as legitimate, however, Lindholm's transfers to them would clearly also constitute fraudulent transfers. Lindholm clearly made these transfers with the intent of shielding his assets from at least Gamlestaden AB.

## VI. CIVIL CONSPIRACY

 While under Connecticut law there is technically no such thing as a civil action for conspiracy, an action is permitted "for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." *Marshak v. Marshak*, 226 Conn. 652, 669, 628 A.2d 964 (1993). The elements that plaintiff must prove in order to recover for such damages are:

(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.

*Id.* at 665, 628 A.2d 964 (quoting *Williams v. Maislen,* 116 Conn. 433, 437, 165 A. 455 (1933)).

 Plaintiff asserts the existence of three civil conspiracies. First, plaintiff asserts that Backstrom, Atlantic Brands and Ahlstroem conspired to commit the fraudulent transfer involving the mortgage transferred to Ahlstroem. While we have already found that there was no actual transfer to Ahlstroem, there was a nominal unlawful transfer to Ahlstroem, and this act has resulted in damage to plaintiff in further increasing its costs in this litigation. As we have already discussed, we find that Atlantic Brands is the alter ego of both Lindholm and Backstrom. Therefore, while Backstrom may not conspire with himself, we find that he clearly conspired with Lindholm in attempting to transfer Atlantic Brands assets beyond the reach of existing creditors.[40] We

---

**39.** As we previously held in our April 29, 1996 decision on defendants Backstrom, Lindholm, Kerstin Lindholm, Atlantic Brands, Lava, and Alkali's motion to dismiss, the fact that plaintiff did not attempt to pierce Lexmar Liberia's corporate veil prior to the alleged transfers does not invalidate plaintiff's fraudulent transfer claims. As alter egos, defendants are liable for each other's obligations, and plaintiff's claims against Lexmar Liberia must also be viewed as claims against each of its alter egos. Any requirement that the creditor's claim arose before the transfer was made or the obligation was incurred is therefore satisfied.

**40.** The claims of conspiracy involving Atlantic Brands are not barred by the "intracorporate conspiracy doctrine." Pursuant to that doctrine,

"[e]mployees of a corporate acting in the scope of their employment cannot conspire with one another or with the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself." *Day v. General Electric Credit Corp.*, 15 Conn.App. 677, 684, 546 A.2d 315, *cert. denied,* 209 Conn. 819, 551 A.2d 755 (1988). This doctrine could only be logically applied if we were to acknowledge the independent existence of Atlantic Brands.

Even if Atlantic Brands was an independent entity, however, the doctrine would still not bar these claims. Backstrom and Lindholm cannot be said to have acted "in the scope of their employment" when conspiring to be the recipient of fraudulent transfers. When individuals are motivated by an independent personal stake in achieving the corporation's objective, the doc-

also find that Ahlstroem participated in this conspiracy by falsely asserting his ownership interests in Intermobil. Plaintiff is thus entitled to judgment on this count against Backstrom, Lindholm and Ahlstroem.

■ Next, plaintiff asserts that Atlantic Brands, Lindholm, Kerstin Lindholm and Finance Generale conspired to commit the fraudulent transfers of mortgages on Robin Hill and Smokey Hill. Kerstin Lindholm's name, like Ahlstroem's, was fraudulently asserted in order to shield assets from defendants' creditors. Unlike Ahlstroem, however, we do not find that Kerstin Lindholm participated in this fraud. Lindholm could not have conspired with Finance Generale since, as discussed above, Finance Generale was his alter ego. Lindholm's conspiracy to fraudulently transfer the mortgages, however, did involve Backstrom, as Atlantic Brand's alter ego, and we therefore find that plaintiff is entitled to judgment on this count against both Backstrom and Lindholm.

Finally, plaintiff alleges a conspiracy between Lindholm, Lava and Alkali relating to Lindholm's transfer of his Piney grantor's rights. As we have already disregarded Lava and Alkali's independent existence, this alleged conspiracy does not involve "two or more people." This claim is therefore legally insufficient, and plaintiff is therefore not entitled to judgment on this count.

## CONCLUSION

On plaintiff's first cause of action, to pierce the corporate veils and hold all defendants' liable for Lexmar Liberia's debt, judgment shall be entered against Backstrom, Lindholm and all alter ego defendants discussed above.

Plaintiff may not recover on its second cause of action, bad faith breach of contract for the reasons already discussed.

On plaintiff's third, seventh, and twelfth causes of action, for fraudulent transfers, judgment shall be entered for plaintiff to the extent that we void all such nominal transfers. As we have held, we find that the interests involved were not actually transferred. Alternatively, to the extent that transfers actually occurred, plaintiff would be entitled to judgment on these causes of action against all involved defendants.

The fourth, fifth, eighth, ninth, thirteenth, and fourteenth causes of action are alternative grounds for recovery on the alleged fraudulent transfers discussed in the third, seventh, and twelfth causes of action and are therefore redundant.

On the sixth cause of action, for conspiracy to fraudulently transfer the mortgage to Ahlstroem, judgment shall be entered for plaintiff against Backstrom, Lindholm and Ahlstroem.

On the tenth cause of action, for conspiracy to fraudulently transfer the mortgages on Robin Hill and Smokey Hill to Finance Generale, judgment shall be entered for plaintiff and against Backstrom and Lindholm.

Judgment shall be entered for plaintiff on the eleventh cause of action, to pierce the corporate veil of Finance Generale, to the extent that we find Lindholm is the alter ego of Finance Generale.

Plaintiff may not recover on its fifteenth cause of action, conspiracy between Lindholm, Lava and Alkali, since, as discussed above, Lava and Alkali are mere alter egos of Lindholm. For the same reason, plaintiff is entitled to judgment on its sixteenth cause of action to the extent that we find that Lindholm is the alter ego of Lava and Alkali.

Finally, as is discussed above, plaintiff may not recover on its seventeenth cause of action, for fraudulent non-disclosure for the reasons stated above.[41]

trine of intracorporate conspiracy does not apply. *See generally Girard v. 94th Street & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *see also Cole v. University of Hartford*, 391 F.Supp. 888, 893 (D.Conn.1975) ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them

persons separate from the corporation in legal contemplation. The plaintiff must also allege that they acted other than in the normal course of their corporate duties.").

**41.** The eighteenth and nineteenth causes of action have already been dismissed pursuant to our July 29, 1996 opinion, 934 F.Supp. at 39, 41.

For the foregoing reasons, judgment shall be entered against Backstrom, Lindholm, and all corporate, partnership and trust defendant alter egos in the amount of $11,964,-223.82, plus pre-judgment interest from April 25, 1996 on the first, eleventh and sixteenth causes of action. To the extent plaintiff deems it necessary to do so, it shall submit to the Court proposed orders of attachment with respect to the interests of any liable defendant in any property belonging to any liable defendant until such time as judgment herein has been satisfied.

Any transfer of assets or mortgages from any liable defendant to any other liable defendant, Ahlstroem, and Kerstin Lindholm is hereby void, and defendants are enjoined from transferring or otherwise encumbering any of their assets until such time as judgment herein has been satisfied. Kerstin Lindholm and Ahlstroem are hereby enjoined from asserting any interest in any defendant discussed above. Lindholm is also hereby enjoined from transferring or otherwise disposing or effecting his grantor's rights in Piney prior to satisfaction of judgment.

■ We also find that plaintiff is entitled to punitive damages from Lindholm and Backstrom on the sixth and tenth causes of action, involving conspiracies to fraudulently transfer assets. Backstrom and Lindholm's fraudulent attempts of shielding their assets were clearly wanton and wilful malicious misconduct. *See Markey v. Santangelo*, 195 Conn. 76, 77, 485 A.2d 1305 (1985) (in order to recover punitive damages, "the pleadings must allege and the evidence must show wanton or wilful malicious misconduct"). While the conspiracies to commit the fraudulent transfers were not all conceived for the purpose of defrauding only plaintiff, they were certainly intended to hinder all creditors' attempts of collecting on legitimate obligations. In addition, Backstrom and Lindholm's continued and intentional dishonesty throughout this litigation was clearly designed to frustrate plaintiff's attempts of collecting on its judgment against Lexmar Liberia. *See Vandersluis v. Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978) ("Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others

or an intentional and wanton violation of those rights.").

■ Under Connecticut common law, punitive damages are restricted to the reasonable expenses properly incurred in the litigation, less taxable costs. *See Markey*, 195 Conn. at 80, 485 A.2d 1305. In order to calculate punitive damages, therefore, plaintiff must offer evidence of the costs of litigation. *See Vandersluis*, 176 Conn. at 359, 407 A.2d 982; *Chykirda v. Yanush*, 131 Conn. 565, 569, 41 A.2d 449 (1945). Plaintiff is hereby granted leave to move for punitive damages within 30 days of the filing of this opinion. Accompanying any such motion, plaintiff shall submit appropriate documentation detailing the costs, including attorneys' fees, that it has incurred in litigating this action.

To the extent plaintiff deems it necessary that we enter additional injunctions or orders to enable it to collect on its judgment, it shall make submit proposed orders or injunctions to the Court.

SO ORDERED